Jordan, vs. The State of Georgia.

No. 2.—RANDAL S. JORDAN, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] In an indictment for the murder of a slave, it is not necessary to aver that the slave was not in a state of insurrection at the time, nor that the death did

not happen by accident, in giving the slave moderate correction. Such matter must come in as a defence.

[2.] When a new county is formed from an old one, and before its formation a crime was committed on the territory taken from the old county, the indictment is correct if it charge that the offence was committed in that portion of the old county which was taken to form the new one.

[3.] Motion to quash an indictment and motion for a verdict of acquittal because of alleged defects in the indictment are in the nature of a demurrer, which must be filed by way of demurrer on arraignment and before plea pleaded.

[4.] Presiding Judge is the trior of the competency of jurors, and his judgment in regard to the competency, will be seldom interfered with.

[5.] It is not sufficient to disqualify a person as a juror to prove that he was born without the United States. It must be shown that he has not been naturalized, which may be done by his own oath, or by any competent evidence the the party may be able to produce.

[6.] It is no ground for a new trial that the panel of the jury put on the prisoner does not number forty-eight, it he does object at the time the panel is put on him.

[7.] On the indictment of a manager or overseer for the murder of a slave, that the owner furnished him with the instrument with which the killing was effected, is no evidence.

[8.] That the prisoner struck the father of the girl beaten, to prevent his coming to her aid or relief, when in a dying condition, is admissible as evidence of malice against the girl.

[9.] The finding of the accused guilty of manslaughter on an indictment for murder, is an acquittal of the charge of murder, and if the Court be of opinion that the finding was wrong, and ought to have been for murder, it cannot grant a new trial.

[10.] The Act of 1799, to carry into effect the 12th section of the 4th article of the Constitution, is not repealed by the penal code of 1833.

[11.] If on an indictment for murder the jury find the accused guilty of manslaughter, it is an acquittal as to the charge of murder, and if the Court believe him to be guilty of murder, it cannot grant a new trial.

Indictment for murder in Dougherty Superior Court. Tried before Judge ALLEN, June Term, 1857.

Randal S. Jordan was indicted for the murder of a negro girl named Mariah, the property of John H. Dawson.

Prisoner's counsel moved to quash the indictment, on the ground that it was not alleged, that the slave was not in a state

of revolt, or the killing did not happen while inflicting moderate correction.

The Court overruled the motion, and prisoner excepted.

After reading the *indictment*, and before any testimony was introduced, prisoner's counsel moved for a verdict of not guilty, on the grounds that the indictment showed that the crime was committed in the *County of Baker ;* and did not charge that the killing did not take place while there was an insurrection or revolt, or that the death did not happen by accident in giving such slave moderate correction.

The Court overruled the motion and prisoner excepted.

In making up the jury, prisoner's counsel moved to put John S. Moreman upon triors, and to be allowed to prove that said juror had formed and expressed fixed opinions, and proposed to introduce the juror himself, to prove that fact, and to ask him if he had not formed and expressed a fixed opinion. Counsel stating that the juror himself was the only person by whom they could prove the fact, within their knowledge.

The Court refused the motion, and put the juror upon the prisoner, and his counsel excepted.

The prisoner put *Robert Bears* upon triors, and with the consent of the State, asked him, if he was not a partner of John H. Dawson, the prosecutor, and if he had not had frequent conversations with him and others, and if from these conversations he had not formed an opinion which he now entertained ? to all of which he answered in the affirmative. The counsel for the State then asked him if he would not be governed entirely by the evidence and find a verdict accordingly ? To which question counsel for prisoner objected, and the Court overruled the objection, and the juror answered that he would. Prisoner's counsel then asked him if it would not take a greater amount of evidence to remove that opinion than if he had heard nothing about the matter ? He

replied, that perhaps it might.   Prisoner's counsel objected to his being put upon prisoner, the Court overruled the objection, and held the juror competent, and prisoner excepted.

*James Harlett,* a juror, being called, was asked by prisoner's counsel (before the oath prescribed by Act of 1856, was administered to him) if he was not born without the limits of the United States ?   To which he replied that he was; counsel for the State asked him, if he had not been naturalized, and exercised the rights of a citizen ?   To which question prisoner objected.   The Court overruled the objection, and the juror answered that he had, upon which the Court pronounced him competent, and he was put upon the prisoner and challenged, and prisoner excepted.

There were but forty-seven jurors put upon prisoner in the last panel, the prisoner not knowing it until afterwards, when the name of John Rutland, one of the forty-eight was called, and he failed to answer, and was not in the Court-House at the time the panel was put on prisoner.   He was sent for, and being brought in, was asked if he was put upon prisoner with the other forty-seven; he replied that he was not. Prisoner objected to the array on this ground.   The Court overruled the objection, and the juror was put upon prisoner, but disqualified himself on the question as to partiality, and prisoner excepted.

The jury being made up, the following evidence was submitted on the part of the State.

*Allen T. Mallard,* testified, that he knew a negro girl by the name of Mariah, the property of John H. Dawson, and was present at her death on the 23d July, 1853, in then Baker, now Dougherty county.   Defendant was overseeing for Dawson on the plantation of Dawson & Collier at the time. Mariah was taken and brought to witness by another negro girl, and he gave her up to Jordan, who took her and whipped her some time with a strap; thought Jordan was excited

Jordan, vs. The State of Georgia.

and after he had whipped her a while, called to him to stop; don't know whether he heard or not; he continued whipping her awhile longer, and then let her up.  She had been dropping peas and had a vessel to drop from, and after he let her up, she went towards the vessel, and, as she went defendant continued to strap her, following . after her as she went towards the corn, and directly, witness heard some of the negroes who were working in the field hollow out; "Mr. Jordan has killed Mariah."  When witness came up to her, she was dying, or had fainted, and had a white froth on her lips.  Jordan remarked, that he thought she was "possoming."  Witness said he thought not.  Jordan then sent after Dr. Dickinson, and made a negro boy take Mariah to the house. When she arrived there, if not dead, she could not breathe as far as witness could see.  They put mustard to her wrists and ankles, and witness started home and met Dr. Postell, who had been sent for.  Witness returned with him and when he reached the house, the girl was perfectly dead.  Witness had been gone only a few minutes, not more than five or ten; thinks it was not more than fifteen minutes from the time they left the field.  The whipping took place in the field. Witness was some five steps off when Jordan began to whip the girl, not more than ten steps.  The girl was not confined; Jordan had her down on the ground; he would push her down.  The strap was a leather one, very thick; commencing at the butt three ply, and after eight or ten inches two ply, and then one ply; the strap had a leather handle; was made of sole leather; cannot say how thick.  Jordan held her sometime in one position and then in another, whipping her sometime in one place and then in another.  Does not know how old she was; she was not twenty years old; large enough to plow; was about half grown.  Witness thought he called to Jordan loud enough for him to hear; he spoke low, because he did not want the negroes to hear him.  Jordan would sometimes turn her on her all fours; sometimes on her belly; sometimes had her head down, and sometimes

up; don't know how long he was whipping her; it may have been half an hour, probably not so long. He had her head confined at one time; does not recollect his placing her head between his legs. When he had her head under his knees, he held on to her clothes. When he let her up she appeared sullen, as if she would not do what she was told; she staggered a little as she went off. Jordan strapped her sometimes on her back and sometimes on her hips. The girl was twenty or forty yards off when witness came up. Jordan was walking beside another negro, who appeared determined to go where the girl was lying, and appeared to be attempting to keep him off; thinks he struck the negro boy with his strap; the boy was named Spencer. Does not know what he struck him for; the boy had disobeyed Jordan's orders, and was trying to come where the girl was lying. Spencer was the girl's father as witness thinks. Mariah was lying down when witness saw Jordan with Spencer. The straps could be heard by witness; he cannot say how long it was after the strapping commenced before he heard the cry that "Mariah was dead." Spencer was not working far from where the girl was, and when witness got up there, he was up very close. Cannot say how many licks Jordan gave her. Witness was excited and might not make a correct estimate, but thinks there was between four hundred and a thousand. The strap made a great deal of noise, but cannot say how hard they were, as they usually make a great noise. The girl seemed to be suffering great pain. Does not think it was an hour from the time the whipping began, till she died  When she was carried and delivered to Jordan, she seemed to be well. Witness had not whipped her while in his possession.

*Cross-Examined.*—Cannot say how many lashes were inflicted; there was nothing extraordinary in the way the girl was held, as far as witness saw. There was nothing unusual in the way she acted when she was whipped; when she went off she looked sullen or bewildered, or determined not to do what she was told. Jordan remarked to witness when

he came up, that she was playing possum. Does not know how long Jordan had been there; he had been there but a short time. Thinks he has seen Mr. Collier one of the partners with the strap. Does not know that it is a common thing to use such things. He never saw but one before. They are used to keep from drawing blood like a cowhide; never used one. Thinks a person using one might hurt a negro worse than he had any idea of.

*Re-Examined by State.*—The difference between the straps commonly used, and the one Jordan used is, that his was much heavier. It happened about 11 o'clock in the morning; it was very warm. Corn was growing in the field, and it was as high as witness' head; this fact made the field much more oppressive and hot. Witness did not say he saw that strap in Mr. Collier's hands, but one like it. It was frequently carried by him at his saddle.

*Re-Examined by Defence.*—It is not the habit of the country where an overseer is placed upon a plantation for the owner to leave the whip upon the place, and the overseer generally has the whip that is given to him, and if his employer had a preference would use it. Thinks he saw the strap which Jordan had in Mr. Collier's hand or at his saddle.

*Re-Examined by State.*—Is not an overseer now, but was at the time of this occurrence.

*Again by Defence.*—Was overseeing at the time on the plantation of Col. Lawton. Does not know the extent of the girl's exhaustion at the time she was brought in. She was brought in as a runaway.

*Capt. N. R. Roberts*—Saw the negro girl at Dawson's house after she was dead. Was on the inquest. She was in the piazza; had the appearance of having been severely whipped; she seemed to have been cut to the bone on the thigh, and the wounds were filled with clotted blood; was the worst whipped girl he ever saw; examined her back and found no gashes. It was extremely hot, in July; thinks she was about

thirteen years old. The strap seemed to be three double; thinks there ought to be a great difference made in the correction of negroes, and would not think of whipping a girl of that size with more than a switch. Dawson and Collier were both absent. Jordan was present at the inquest. The girl was cut on the thigh by Mr. Keaton, to see how far she was cut, and it was black and blue, and filled with clotted blood.

*Cross-Examined.*—Would not keep such an instrument on his place as the strap he saw. The thigh was cut by Keaton at or about the time the physician's were present; would not use such a strap even if the owner of the place had given it to him. Witness could have killed a three-year old bull with it. If the owner of the place had ordered the overseer to use such a strap, he probably would have been expected to obey orders.

. A young man with such an instrument in his hands might do much more harm than he was intending to do. Would not suffer such a strap to be used on his place.

*Re-Examined.*—Would not have whipped any sort of a negro with such a strap. Any man of common sense ought to know that a negro ought not to be whipped with such a strap, and if whipped with such a one it ought to be given very lightly.

*Dr. John T. Dickinson.*—Witness is a practicing physician; was sent for by Mr. Jordan in July, 1853, to see Mariah, a negro girl, at the plantation of Mr. Dawson. She was dead when he saw her; seemed to have been whipped to death; the blows were inflicted on her back, thighs and belly; she was bruised all over. The bruises were down to the muscles. The blood was clotted in places. The whipping was the principal cause of her death.

*Cross Examined.*—Witness and Dr. Postell made a very careful post-mortem examination. They opened the scull. The whipping seemed to be the immediate cause of her death,

and to have produced the rushing of the blood to the head, which was the cause of her death. She seemed to have died from appoplexy, caused by the whipping. Other causes produce this rushing of blood to the head; running or exercise might cause it: it being somewhat a matter of uncertainty, which might have caused this appoplexy. The brain disclosed the fact that she died from appoplexy.

*Re-Examined by State.*—A person whose throat is cut or stabbed to the heart, dies of hemorrage; this negro he thinks, died from the whipping.

*Re-Examined by Defence.*—Appoplexy is produced by various causes. Thinks the whipping or the position the negro was in while receiving the whipping, was the cause of this attack. Appoplexy is produced by various causes, and cannot state what position the negro was in while being whipped.

The jury found the defendant guilty of voluntary manslaughter, and recommended him to the mercy of the Court.

A motion was made in arrest of judgment:

1st. Because the indictment does not charge that the killing did not take place while the slave was in a state of revolt or insurrection, and did not happen by accident in giving such slave moderate correction.

2d. Because the indictment does not charge the offence to have been committed in the county of Dougherty, but shows that it was committed in the county of Baker, or in that portion of Dougherty which was then Baker, at the time the offence was committed.

The Court overruled the motion in arrest of judgment.

A motion was then made for a new trial, on the grounds taken in the motion for arrest of judgment and upon the rulings and decisions excepted to in the formation of the jury above stated, and further:

Because the jury found contrary to law.

Because the jury found contrary to evidence.

Because the jury found contrary to law and evidence.

Because the Court erred in charging the jury that it made no difference whether the owner of the slave furnished the instrument with which the killing took place, or not, he having admitted that the instrument was furnished by the employer;—which charge had a tendency to weaken the defence and was an expression of an opinion as to what had been pro ven.

Because the Court erred in admitting the testimony of the witness, Mallard, as to the prisoner whipping Spencer, the prisoner objecting, and the Court overruling the objection.

Because the jury found contrary to law and evidence in this, that they found voluntary manslaughter, which from the evidence could not be true.

Because the Act of 1799, under which defendant was tried, is repealed by the Penal Code of 1833.

The Court refused the motion for a new trial, and defendant excepted.

STROZIER, WARREN and SLAUGHTER, for plaintiff in error.

Solicitor General Evans, represented by McCay and R. F. LYON, for the State.

*By the Court.*—McDONALD, J. delivering the opinion.

[1.] The motion in arrest of judgment ought not to have been sustained, and in our judgment the Court below committed no error in overruling it. The twelfth section of the fourth Article of the Constitution does not define what shall constitute the murder of a slave, but only declares that the maiming or killing a slave, shall be established by like proof, and subject to such punishment, as in case the same offence had been committed on a free white person. It is restrictive of the power of the Legislature. The exception does not alter the case. That is permissive to the Legislature. If a slave be killed in a state of insurrection, or if the death should

happen by accident in giving the slave moderate correction, the Legislature may mitigate the punishment, or relieve the accused party from all punishment. The statesmen contemporary with the Constitution construed that provision of the Constitution as we do, and passed an act to carry it into effect. *Cobb* 982. It has never been held that, in indictments for the murder of a white person, after charging the offence in the usual manner, there must be negative averments, that it was not done in self-defence, and that the danger was not so urgent and pressing at the time of the killing, as to render it absolutely necessary, to save his own life. This is a separate section of the Penal Code. *Sec. XV. Cobb* 785. This must come in as a matter of defence. So in the case of killing a slave. If murder be charged, and the killing was justifiable under the law, it must be brought in by way of defence.

"If a clause of exception contained in the same statute, excuses a person under such and such circumstances, or gives license to persons so and so qualified, so as to excuse or except them out of the general prohibitory words, that must come by way of plea or evidence, that the party is not within such general prohibition but excepted out of it." *Rex. vs. Pemberton,* 2. *Bur.* 1036. That case was an indictment for exercising the occupation of a tanner, not having served an apprenticeship therein for seven years. The defendant contended that the statutes allowed certain persons to exercise the trade without having served such apprenticeship, and that the indictment ought to specify the qualifications of such persons, and to show that the party is not within any of them. The principle is the same.

[2.] The indictment charges that the offence was committed in that portion of the county of Baker which is now the county of Dougherty. The place where the homicide was committed, is in the county of Dougherty; the plaintiff in error was indicted in Dougherty county, and he was tried in Dougherty county, but it so happens that at the time of the

commission of the offence, there was no Dougherty county, that it has been laid out since; and that within its defined boundaries is the place at which the homicide was committed. It was in the county of Baker before. We think that it is sufficiently charged in the indictment that the offence was committed in the county of Dougherty. The defendant could not have been prosecuted in the county of Baker, at the time the indictment was found; for the territory on which the alleged offence was committed, was no longer in the county of Baker. The Constitution fixed the place of trial, for the benefit of defendants or parties accused, in the county where the offence was committed, as the locality at which he could most conveniently secure the attendance of witnesses. The change of the name of a county cannot operate to his detriment in any way, nor can the change of a county line.

[3.] The two first grounds in the motion for a new trial are disposed of by what we have said on the motion in arrest of judgment. But we will say additionally that the objection to the indictment ought to have been made by demurrer in writing, at the arraignment, before plea pleaded. It was too late afterwards. See case lately decided at Savannah, *Thomasson vs. State of Georgia.* Motion for a verdict for a defect in the indictment is, in effect, a demurrer.

[4.] This Court has held that under the Act of 1856, the presiding Judge is the trior of the competency of jurors. *Reid vs. The State,* 20. *Ga. Rep.* 688. The third ground in the motion for a new trial was therefore properly overruled.

The juror Robert Bears was examined as to his competency. His evidence was fully heard, and he was pronounced competent by the presiding Judge, who was the trior, whose judgment, we are not prepared to say, was such as to call for our interference. *Costly vs. The State,* 20. *Ga. Rep.* 629.

[5.] Daniel Hartlett the juror was asked before the statuary oath was administered, in regard to his birth place, and he replied that he was born without the limits of the United States. It was no evidence of disqualification if he was not

born within the limits of the United States. If he was a free white male *citizen* of the age of twenty-one years, he had one of the qualifications of a juror. *Acts of* 1855 & 1856, 229.

If a person be drawn from the jury-box, or summoned by the Sheriff as a *tales* juror, he is presumptively a qualified juror. The Sheriff is not to be presumed to have returned a disqualified person; but if a person not qualified shall be returned on a jury, he shall be discharged on the challenge of either of the parties and proof thereof; or on the juror's own oath. *Cobb* 546. The juror answered that he was born out of the limits of the United States; but that did not overcome the presumption of qualification, for his return on the panel of the jury implied that, if he was born the subject of another government, he had been naturalized here.

[6.] That the last panel put on the prisoner, consisted of forty-seven instead of forty-eight jurors, does not entitle him to a new trial. The prisoner was entitled to a list of the jury, who are to be called over before they are put on him, and it is his own fault, if the juror does not answer to his name, that he does not insist on his being brought into Court, or if that cannot be done, that his place be supplied. In this case the prisoner lost nothing, for the juror was set aside for cause.

[7.] In the charge of the Court to the jury that "it made no difference, whether the owner of the slave furnished the instrument with which the killing took place or not," there is no error. If the owner furnished the instrument to the prisoner *for the purpose of killing the slave*, instead of exculpating him, or mitigating *his* offence, it would have made the master accessory to the crime. Almost every master who employs a manager furnishes him with an instrument for giving moderate correction, to be used if necessary for self-protection, but he never intends that it shall be used for inflicting cruel and unreasonable punishment.

[8.] We think there was no error in admitting the evidence

of the prisoner's striking Spencer. Spencer was the father of the girl who had been whipped. He witnessed the cruelty. She was then lying dead or dying, and the prisoner's refusal to allow her father to go to her aid and relief under these circumstances, was certainly evidence of deeply seated malice against the girl he had beaten. It was proper for the consideration of the jury.

[9.] The counsel for the prisoner moved for a new trial on the ground that from the evidence, the jury could not, according to law, find a verdict of voluntary manslaughter. The jury were the judges of the law and the facts. In their finding they have passed upon both.

They must have found that the prisoner intended to kill the slave, and in this respect, the Court is not disposed to come to a different conclusion: but although the jury have found, in the proof submitted to them, some circumstances which, under the law, they thought justified them in reducing the crime to manslaughter, we confess that it is difficult for us, under our construction of the law, to come to the same conclusion. The State does not and cannot move for a new trial. If we order a new trial, it must be on the ground that, according to our judgment, the prisoner is guilty of murder. He was indicted for murder. The jury found him guilty of voluntary manslaughter. This finding acquits him of the charge of murder, and however contrary to law it may be, the Court cannot grant a new trial, so as to subject him to a trial for the offence of which the Court may believe him to be guilty. The same section of the Penal Code which says that the jury shall be judges of the law and the fact, declares that on the acquittal of any defendant or prisoner, no new trial shall, on any account, be granted by the Court. §309 *Penal Code.* *Cobb* 835.

[10.] The Penal Code does not repeal the Act of 1799, under which the defendant was put upon his trial. It repeals a great many acts specially mentioned therein, but that act is not among them. There is nothing in the Act of 1799, which

militates against the Act of 1833, and the general words of repeal do not therefore affect its validity.

[11.] If the verdict be contrary to law, contrary to evidence, or contrary to law and evidence, a new trial ought to be granted, except that if the Court believe the accused is guilty of murder, and the jury, being judges of the law and the fact, have acquitted the prisoner of murder, with which he is charged, by finding him guilty of an offence of lower grade, the Court is expressly forbidden to grant a new trial in such case. I have looked in vain through the evidence for a single mitigating circumstance in this case to reduce the crime below the grade of murder. The prisoner had power over the slave. He exercised it most cruelly, inflicting on her a beating, from four hundred to a thousand blows, which showed in the language of the law "an abandoned and malignant heart." We cannot think that he was, on any of the grounds, entitled to a new trial.

Judgment affirmed.